**IN THE UNITED STATE DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PIVOTAL GP HOLDING, LLC, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| VILLAGE OF BROADVIEW, | ) | |
| DAVID UPSHAW, in his official capacity | ) | |
| as Building Commissioner and Economic | ) | |
| Development Director for the Village of | ) | |
| Broadview and KATRINA THOMPSON, | ) | |
| in her official capacity as the Mayor of | ) | |
| the Village of Broadview, | ) | |
| | ) | |
| *Defendants*. | ) | |

## COMPLAINT

Plaintiff, PIVOTAL GP HOLDING, LLC ("Pivotal"), by and through its attorneys, Taft Stettinius & Hollister LLP, for its Complaint against Defendant Village of Broadview (the "Village"), David Upshaw, in his official capacity as Building Commissioner and Economic Development Director for the Village of Broadview ("Upshaw"), and Katrina Thompson, in her official capacity as Mayor of the Village of Broadview ("Mayor," and collectively with the Village and Upshaw, the "Defendants") states as follows:

## NATURE OF THE CASE

1.      This action seeks, *inter alia*, damages, a writ of mandamus, and relief for violations of the Fair Housing Act and the Due Process Clause arising from the Village's unlawful and arbitrary refusal to allow Pivotal to proceed with the development of an affordable housing community known as Broadview Community Flats (the "Project"). The Village spent years negotiating with Pivotal, approving the Project's zoning, design, and lease terms, and publicly

promoting the Project as a source of critically needed affordable housing for the community. Despite these official approvals, binding agreements, and prior commitments, upon which Pivotal reasonably and detrimentally relied, the Village abruptly reversed course, refusing to issue building permits, breaching its contract with Pivotal, derailing the Project, jeopardizing Pivotal's multi-million-dollar investment, and preventing the development of affordable housing that countless community members depend upon. The Village's willful and arbitrary misconduct exceeds the Village's legal authority, violates a valid and enforceable contract, infringes Pivotal's due process rights, contravenes applicable state and federal laws, and disregards the Village's own ordinances and prior approvals.

## THE PARTIES

2. Plaintiff Pivotal is a Georgia limited liability company that maintains its principal place of business in West Chester, Ohio. Pivotal's sole member is Pivotal Housing Partners, LLC ("Pivotal Housing"), which is a Georgia limited liability company that maintains its principal place of business in West Chester, Ohio. Pivotal Housings members are: (i) Brian McGeady, who is an individual domiciled in Cincinnati, Ohio, and is thus an Ohio Citizen; (ii) Michael Reichman, who is an individual domiciled in Cincinnati, Ohio and is thus an Ohio citizen; and (iii) Monarch Private Investments, LLC, a Georgia limited liability company that maintains its principal place of business in Atlanta, Georgia, and is thus a Georgia Citizen. Pivotal is thus a citizen of Georgia and Ohio.

3. The Village is a home rule municipal corporation organized under the laws of the State of Illinois and is situated in Cook County, Illinois.

4. Defendant Upshaw is Building Commissioner and Economic Development Director for the Village who conducts his principal place of business in Broadview, Illinois.

5.     The Mayor is the mayor of the Village who conducts her principal place of business in Broadview, Illinois.

## JURISDICTION AND VENUE

6.     This action arises under the Constitution of the United States, particularly the Fourth Amendment to the Constitution of the United States, under the laws of the United States, particularly the Civil Rights Act, Title 42 of the United States Code, Section 1983, the Fair Housing Act, Title 42 of the United States Code, Section 3601, and under the laws of the State of Illinois.

7.     The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, Sections 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367.

8.     This Court has jurisdiction over this action pursuant to Title 28 of the United States Code Sections 1331 and 1367, as Plaintiff asserts claims under federal law and the state law claims arise out of the same facts as the Federal claims.  Venue is proper under Title 28 of the United States Code, Section 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims and actual harm to Plaintiff occurred within this district.

9.     There is complete diversity of citizenship between the parties, as Plaintiff is a citizen of Georgia, and its sole member, Pivotal Housings, is a citizen of Ohio.  Moreover, the three members of Pivotal Housings are all citizens of Ohio.

10.     There is an amount in controversy totaling $5,335,292.00, which exceeds $75,000.00, exclusive of interest and costs.

3

## STATEMENT OF FACTS

**The Project and its Public Importance**

11.     Pivotal is a real estate development and management company that focuses solely on developing and operating high quality affordable housing.

12.     Pivotal proposed to develop the Project-- a 36-unit affordable housing development with retail space on the ground floor -- on a property owned by the Village and located at 1301 Roosevelt Road in Broadview, Illinois (the "Property").

13.     The Village's population has low incomes relative to the broader area and, therefore, a dire need for affordable housing. According to the Chicago Metropolitan Agency for Planning ("CMAP") Community Data Snapshot for the Village,[1] as of 2023, 18 percent of households within the Village had an annual household income of less than $25,000.00 (compared to just 13.4 percent in the broader CMAP region) and 24.7 percent of households had an annual household income between $25,000.00 and $49,000.00 (compared to only 14.5 percent in the CMAP region). In 2023, the per capita income in the Village was $32,654.00 (compared to $49,183.00 in the CMAP region).

14.     Pivotal intended to finance the affordable housing component of the Project using an affordable housing tax credit from the Illinois Housing Development Authority (IHDA). Pivotal specializes in Low Income Housing Tax Credit development and is not a market rate developer. The concept agreed to at the time was a mixed-use affordable housing development that leveraged the aforementioned tax credits and funds from Cook County's Home Investment Partnerships Program.

---

[1] Available at: https://www.cmap.illinois.gov/wp-content/uploads/dlm_uploads/Broadview.pdf (last visited February 10, 2025), The Court may take judicial notice of information contained on governmental websites *United States of America v. State of Illinois*, 795 F. Supp. 3d 1057, ¶ 13, n.1 (N.D. Ill 2025).

15.     On March 28, 2024, Wyllys Mann ("Mann"), Director of Facilities Services at Pivotal, sent an email to Upshaw transmitting a commitment letter from the Cook County Department of Planning and Development stating that the County would provide $3,000,000.00 through the Home Investment Partnerships Program to help finance the Project.  A true and accurate copy of the email and letter are attached as **Exhibit 1**.

16.     On the same date, the Mayor issued a written Letter of Support to the Illinois Housing Development Authority ("IHDA") for the Project, affirming that "demand for affordable family housing in Western Cook County is undeniable" and underscoring the Village's dedication to creating safe, accessible, and much-needed housing for families in the community.  A true and accurate copy of the Mayor's March 28, 2024 letter is attached as **Exhibit 2**.

17.     In addition to the March 28, 2024 letter from the Mayor evidencing the Village's support for IHDA financing of the Project, a series of Village approvals and binding agreements, described below, further memorialized the parties' mutual commitment to making the Project a reality.

**The Letter of Intent**

18.     On March 29, 2024, the Village and Pivotal entered into a Letter of Intent ("LOI"), which established the foundational terms and the parties' intent to proceed with the Project, under which Pivotal's affiliate, Broadview Community Flats, LLC ("BCF"), would lease Village-owned land for the development of affordable housing and market-rate housing as set forth in Pivotal's Low-Income Housing Tax Credit Application.  A true and accurate copy of the LOI is attached as **Exhibit 3**.

**Village Planned Development and Site Plan Approval**

19.     On March 20, 2024, only eight days before the Mayor issued their support letter to IHDA and nine days before the Village and Pivotal executed the LOI, Pivotal submitted its Planning, Zoning, and Site Plan Application (the "Application") seeking a Special Use and Variance for the Project.  A true and accurate copy of the Application is attached as **Exhibit 4**.

20.     Following a public hearing held on April 9, 2024, the Village's Zoning Board of Appeals recommended that the Village Board of Trustees approve the Application.

21.     On October 7, 2024, the Village Board of Trustees adopted a Planned Development Ordinance ("PD Ordinance") governing the Project's design, density, and unit mix.  A true and accurate copy of the PD Ordinance is attached as **Exhibit 5**.  In addition, and in connection with the adoption of the PD Ordinance, the Village approved a site plan for the Project, a true and correct copy of which is attached as **Exhibit 6**.

22.     On March 5, 2025, Mann sent an email to Upshaw asking for the Village's approval of a revision to the site plan as a result of environmental conditions found on the Property.

23.     On March 31, 2025, Mann sent an email to Upshaw asking for an update on the Village's review of proposed revised site plan, stating "we just need to know from you what the next steps are to officially revise the Site Plan."  A true and accurate copy of the March 31, 2025 email is attached as **Exhibit 7**.

24.     On April 17, 2025, Upshaw emailed Mann stating that the Village supported the revised site plan.  A true and correct copy of the revised site plan is attached as **Exhibit 8**.

**The Lease**

25.     On April 11, 2025, the Village and BCF reached agreement on the final draft of the Ground Lease. Thereafter, on May 14, 2025, Mann met with the Mayor to discuss the Project and the parties' agreement to move forward pursuant to the Lease.

26.     Following that meeting, Matthew Welch ("Welch"), counsel for the Village, circulated a lease document (the "Lease," and sometimes collectively with the LOI, the "Project Agreements")) to Mann, Building Commissioner David Upshaw ("Upshaw"), and members of Pivotal's development team, confirming that the document reflected the final, agreed-upon terms. A true and accurate copy of the May 14, 2025 email with the Lease is attached as **Exhibit 9**.

27.     The Village did not identify any outstanding material issues, conditions precedent, or unresolved negotiations with respect to the Lease, leaving the terms fully settled.

28.     Pivotal reasonably relied on the approved PD Ordinance, its meeting with the Mayor, and Welch's statement that the terms of the Lease were final and, therefore, continued its planning and development of the Project.

**The Building Permit Application**

29.     In reliance on the PD Ordinance and the final Lease, Pivotal directed its architects to prepare construction drawings for the Project and file a building permit application.  On or about June 13, 2025, Pivotal applied for a building permit with the Village (the "Building Permit Application"), a true and correct copy of which is attached as **Exhibit 10**.

30.     The Village engaged a third-party reviewer known as Construction Code Services, Inc. (the "Reviewer"), to review the Building Permit Application and provide comments.

31.     On July 9, 2025, Upshaw sent an email to Mann transmitting the Reviewer's review comments regarding the Building Permit Application (the "Review Comments").

32.     Pivotal promptly forwarded the Review Comments to its architect, BDCL Architects (the "Architect").

33.     On August 19, 2025, Pivotal submitted the following to the Village from the Architect:  (i) a full set of revised construction documents; (ii) a narrative of changes made to the construction documents; (iii) responses to the Village's comments; and (iv) a Geotechnical Report which was requested by the Village (collectively, the "Compliance Submission").  A true and correct copy of the Compliance Submission is attached as **Exhibit 11**.

34.     That same day, the Village confirmed receipt of the Compliance Submission. After receipt, the Village did not provide any additional comments regarding the Building Permit Application or the Compliance Submission and related submittals, including, without limitation, plans and construction drawings for the Project.

35.     Section 9-1-2 of the Broadview Village Code (the "Village Code") adopts by reference the International Building Code, 2018, as published by the International Code Council edition (the "Building Code"). Section 105.31 of the Building Code states:

> The building official shall examine or cause to be examined applications for permits and amendments thereto within a reasonable time after filing.  If the application or the construction documents do not conform to the requirements of pertinent laws, the building official shall reject such application in writing, stating the reasons therefor. If the building official is satisfied that the proposed work conforms to the requirements of this code and laws and ordinances applicable thereto, the ***building official shall issue a permit therefore as soon as practicable***" Broadview, Ill., Village Code § 9-1-2 (2018) (*emphasis added*).

36.     After Pivotal filed the Compliance submission, the Building Permit Application and related submittals conformed to the requirements of the Building Code and other applicable laws and ordinances, and, therefore, Upshaw had an obligation to issue a building permit authorizing construction of the Project. However, Upshaw never issued a building permit, in violation of Section 105.31 of the Building Code.

**The Village's Pattern of Modifications and Course of Dealing**

37.    Notwithstanding the finalization of the Lease and the Village's prior approvals, the Village thereafter engaged in a pattern of conduct in which it demanded serial modifications to previously approved and agreed Project terms. These demands were inconsistent with the Project Agreements and the Village's own approvals.

38.    By way of example, the Village required: (a) increases to commercial-use percentages, removal of previously required amenities, and the addition of new unit-level amenities within the Planned Development; (b) revisions to the site plan purportedly based on the Village's new fire chief's preferred fire truck access that had already been addressed and resolved; (c) relocation of the Project to a different portion of the Property after the Project's configuration had been approved; and (d) additional third party traffic signal analysis that went beyond the requirements of the zoning process.

39.    In addition, and consistent with the Village's representations that the Project was approved and moving forward, the Village further required Pivotal to undertake an open call for construction bidders for the Project, including contractors solicited by the Village itself. By directing Pivotal to solicit bids and incur construction-phase costs, the Village unmistakably represented that the Project had entered implementation, inducing Pivotal to continue investing substantial resources in reliance on the Village's conduct.

40.    In an effort to be a good community partner, and in reliance on the Village's prior approvals and the Project Agreements, Pivotal complied with these directives. In doing so, Pivotal was required to redesign the Project multiple times at the Village's insistence, resulting in the loss of substantial sunk costs incurred in reliance on the Village's approvals.

41. Through this course of dealing, the Village treated settled and approved Project terms as indefinitely reopenable, notwithstanding that under the Building Code the Village lacked discretion to request such changes and had a ministerial duty to issue a building permit for the Project.

**Pivotal's Performance and Investment**

42. In reliance on the Project Agreements, the PD Ordinance, the Mayor's public comments, the presence of the project listed prominently on the Village website, and conversations with Upshaw and the Mayor, Pivotal proceeded to develop the Project and incurred substantial costs.

43. Pivotal engaged architects, engineers, environmental consultants, and legal counsel to design the Project and prepare construction documents.

44. Pivotal applied for and secured competitive public funding awards from IHDA and Cook County for the affordable housing component of the Project.

45. Pivotal obtained written support from IHDA and Cook County for the Project.

46. In addition, Pivotal obtained Phase I and Phase II environmental studies, despite the fact that the Village previously represented that a No Further Remediation ("NFR") Letter had been obtained for the Project site. That representation proved false.

47. At its sole cost and expense, Pivotal undertook extensive environmental and engineering work, expending more than $150,000.00 to develop an in-situ remediation plan, which required, *inter alia*, flipping a building from the west side to the east side of the Property.

**Purported Termination and Continued Assurances**

48.     Instead of issuing a building permit, as required by the Building Code, on October 6, 2025, the Village issued a letter purporting to terminate the Project. Pivotal did not receive this letter until October 20, 2025.

49.     On October 8, 2025, Upshaw sent Mann an email similarly purporting to terminate the Project.

50.     However, subsequently, on October 10, 2025, after the Village had already issued a letter purporting to terminate the Project, Mann and Upshaw spoke by telephone, during which Upshaw unequivocally reversed course and affirmatively assured Mann that the Village still intended to move forward with the Project. That assurance was not tentative, conditional, or exploratory; it was a clear representation that the Project remained approved and alive.

51.     Those assurances were reinforced on November 13, 2025, when Mann and other members of Pivotal's development team met in person with senior Village officials, including the Mayor, Upshaw, the Village's Public Works Director, Mathew Ames ("Ames"), and representatives of the Cook County Economic Development Department. At that meeting, the Village again represented, unequivocally, that it intended to proceed with the Project and directed Pivotal to continue moving forward.

52.     On both October 10, 2025 and November 13, 2025, the Village represented that it would provide a written list of any items the Village claimed remained outstanding before issuance of permits and commencement of construction (the "Items List").

53.     In reasonable and foreseeable reliance on these repeated assurances by the Village's highest officials and authorized representatives, Pivotal continued to devote substantial time,

resources, and capital to advancing the Project, refraining from abandoning the development or redeploying its personnel and financing to alternative opportunities.

54.     Despite those representations, the Village never provided the Items List in October or November.

55.     In December 2025, counsel for Pivotal, was repeatedly informed by counsel for the Village, that the Village's Items List was forthcoming "within the next few days," with December 23, 2025 identified as the latest date by which it would be provided.

56.     Relying on those representations, Pivotal repeatedly contacted the Village seeking a status update on the Items List but received no response. Pivotal's counsel likewise made multiple follow-up inquiries to counsel for the Village, all of which went unanswered.

57.     On January 26, 2026, the Village's counsel requested a call with counsel for Pivotal, which was scheduled for the following day. During their January 27, 2026 call, the Village's counsel advised that he was simultaneously transmitting the Items List to Pivotal and that the Village's position was "take it or leave it."

58.     Later that same day, the Village's counsel transmitted the Items List.

**The Village's Discriminatory Elimination of Affordable Housing and Complete Reversal of the Project Agreements**

59.     Contrary to the Village's prior representations, the Items List did not identify minor or ministerial items.

60.     Rather, the Village sent an entirely new project requirement list (the "Unilateral Project Overhaul") on January 27, 2025. In the Unilateral Project Overhaul, the Village imposed sweeping and unprecedented new demands, including a requirement that the Project be converted to entirely market-rate housing despite the fact that affordable housing was the basis of the Project, the approved component of the Project Agreements and a central inducement for Pivotal's

12

investment. A true and accurate copy of the Unilateral Project Overhaul is attached hereto as **Exhibit 12**.

61.     This reversal directly contradicts the Village's prior approvals and representations upon which Pivotal reasonably relied and expended significant resources as a result of that reliance.

62.     It also disproportionately harms lower-income residents and deprives Village constituents of much-needed affordable housing opportunities.

63.     By stripping the Project of its affordable housing component after securing zoning approval and other concessions, the Village effectively abandoned its stated housing policy objectives, imposed a discriminatory outcome, reversed its publicly stated support, and frustrated the very public benefits the Project was designed to deliver.

**Damages Incurred by Pivotal**

64.     As a result of Defendant's conduct, Pivotal has incurred, without limitation, the following damages:

(i)     professional fees for architects, engineers, and legal counsel in the amount of $803,608.00;

(ii)    Developer fees in the amount of $1,861,575.00;

(iii)   Lender and investor fees in the amount of $125,000.00;

(iv)    Tax credit fees to IHDA in the amount of $192,817.00;

(v)     Reports (i.e. environmental, green energy) in the amount of $170,512.00;

(vi)    costs for switch gear in the amount of $123,484.00; and

(vii)   carry costs in the amount of $58,296.00.

Pivotal's total actual costs incurred amount to approximately no less than $3,335,292.00. In addition, Pivotal has incurred opportunity costs of approximately $2,000,000.00 by foregoing

alternative development opportunities in reliance on the Village's representations and the Project Agreements.  Pivotal's total damages are in an amount no less than $5,335,292.00.

**COUNT I**
**(Violation of the Fair Housing Act - Disparate Impact**
**42 USCS § 3601)**

65.     Pivotal realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 64 (above) as if fully set forth herein.

66.     The people of the United States, by and through their elected Congress, enacted a statute codified at 42 U.S.C 3601, et seq. and known as the Fair Housing Act (the "FHA").

67.     At all times relevant to the allegations set forth herein, the FHA was in full force and effect.

68.     The FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. 3604(b).

69.     The Project included a multi-family affordable housing component designed to serve lower-income households within the Village and surrounding region. Lower-income households in the Village disproportionately consist of members of protected classes under the FHA, including persons protected on the basis of race, color, national origin, familial status, and disability.

70.     As previously stated, 18 percent of households within the Village have an annual household income of less than $25,000.00 (compared to just 13.4 percent in the CMAP region) and 24.7 percent of households have an annual household income between $25,000.00 and $49,000.00 (compared to only 14.5 percent in the CMAP region).  The per capita income in the Village is $32,654.00 (compared to $49,183.00 in the CMAP region).

14

71. In addition to the disproportionate impact on low-income populations, any refusal to allow affordable housing would also have a disproportionate impact on Black and Latino populations. As of 2023, the CMAP Community Data Snapshot states that 63.1 percent of Village residents were Black (non-Hispanic), and 21.2 percent of residents were Hispanic.

72. The elimination of affordable housing within the Village disproportionately impacts members of protected classes.

73. Acting under color of state law, the Village imposed a requirement that the Project be converted to entirely market-rate housing, eliminating the previously approved affordable housing component.

74. The Village's actions have a disproportionate and adverse impact on members of protected classes by reducing the availability of affordable housing and excluding such persons from housing opportunities within the Village.

75. The Village's conduct makes dwellings unavailable on the basis of race and/or national origin by attempting to block construction of the Project's approved affordable housing component.

76. Pivotal is an "aggrieved person" within the meaning of 42 U.S.C. § 3602(i) because it has been injured by the Village's discriminatory housing practices. The Village's actions have prevented Pivotal from constructing the approved affordable housing units, deprived it of development opportunities and contractual benefits, and caused it substantial financial harm.

77. The Village's actions have a disproportionate and adverse impact on members of protected classes, in violation of the Fair Housing Act, because they reduce the availability of affordable housing within the Village and thereby effectively exclude such individuals from housing opportunities.

78.     The Village's conduct perpetuates and exacerbates the ongoing housing affordability crisis affecting the Village and the surrounding region-- reinforcing patterns of exclusion and disproportionately burdening members of protected classes in violation of the Fair Housing Act.

79.     The Village is enforcing its ordinances in a manner that discriminates against members of a protected class in violation of the FHA.

80.     Pivotal is an "aggrieved persons" as defined in the FHA, 42 U.S.C. § 3602(i), because it have "been injured by a discriminatory housing practice" and "will be injured by a discriminatory housing practice that is about to occur."

81.     Defendants' discriminatory actions in violation of the FHA have delayed and deprived Pivotal of its ability to build the Project and effectively blocked the Project indefinitely.

82.     The Village lacked a legitimate, nondiscriminatory justification for eliminating the affordable housing component, and any purported governmental objectives could have been achieved through less discriminatory alternatives.

83.     As a direct and proximate result of the Village's discriminatory housing practices, approved by and with knowledge of, *inter alia*, Upshaw and the Mayor, Plaintiff has suffered substantial damages.

WHEREFORE, Plaintiff Pivotal respectfully requests that this Court enter judgment in its favor and against Defendant Village of Broadview, and award:

a.     Compensatory damages in an amount to be proven at trial, including all costs, fees, and losses incurred due to the Village's breach of the Project Agreements and deprivation of Pivotal's property interest in the Project;

b.     Reasonable attorneys' fees and costs; and

c.     Such other and further relief as this Court deems just and equitable.

## COUNT II
### (42 U.S.C. § 1983 – Procedural Due Process/ Deprivation of Vested Property Rights)

84. Pivotal realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 64 (above) as if fully set forth herein.

85. Pivotal possessed constitutionally protected property interests, including vested rights arising from:

           i.        the approved PD Ordinance;

           ii.        the LOI;

           iii.        approved site plans;

           iv.        the finalized Lease; and

           v.        the Village's ministerial obligation to issue building permits upon compliance with applicable law.

86. Under the Village Code and adopted Building Code, once Pivotal submitted compliant construction documents, the Village was required to issue the requested permits or provide a written denial identifying specific legal deficiencies in the submission.

87. Pivotal submitted all required revisions and compliance materials, which the Village acknowledged and did not reject.

88. Despite Pivotal's compliance and vested rights, the Village withheld permit approval and imposed new, unauthorized conditions, including elimination of the affordable housing component.

89. The Village deprived Pivotal of its property interests without notice, standards, or an opportunity to be heard.

90. These deprivations were the result of deliberate actions by final municipal policymakers, including, but not limited to Upshaw and the Mayor, who were acting under color of state law, with full knowledge thereof and did not constitute random or unauthorized conduct.

91. The Village's actions constitute official municipal policy, custom, or practice.

92. As a direct and proximate result of the Village's violation of Pivotal's procedural due process rights, Pivotal has suffered substantial damages.

WHEREFORE, Plaintiff Pivotal respectfully requests that this Court enter judgment in its favor and against Defendant Village of Broadview, and award:

      a.     Compensatory damages in an amount to be proven at trial;

      b.     Reasonable attorneys' fees and costs; and

      c.     Such other and further relief as this Court deems just and equitable.

## COUNT III
### (42 U.S.C. § 1983 – Equal Protection/Disparate Impact)

93. Pivotal realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 64 (above) as if fully set forth herein.

94. At all relevant times, the Village acted under color of state law through its Mayor, Building Commissioner, Village Board, and other authorized officials.

95. The Village approved the Project as a mixed-use development that included an affordable housing component through the Project Agreements, zoning approvals, and adoption of the PD Ordinance.

96. After Pivotal satisfied all substantive approval requirements and incurred substantial costs in reliance on those approvals, the Village demanded elimination of the affordable housing component and conversion of the Project to entirely market-rate housing.

18

97.     The Village did not impose comparable demands on similarly situated market-rate developments and departed from its prior approvals and stated housing policies.

98.     The elimination of affordable housing disproportionately harms lower-income residents of Broadview, approximately 10.7% of whom live below the federal poverty line, and minority residents, who constitute approximately 90.8% of the Village's population. These groups include protected classes under the Fair Housing Act, including racial and ethnic minorities, families with children, and persons with disabilities.

99.     By intentionally eliminating approved affordable housing after inducing reliance and investment, the Village treated affordable housing and its intended beneficiaries less favorably without a legitimate governmental justification.

100.     The Village's actions were arbitrary, discriminatory, and violated the Equal Protection Clause of the Fourteenth Amendment which are rooted in the Village's long-standing discriminatory custom, practices and policies.

101.     The challenged conduct was undertaken pursuant to the aforementioned discriminatory official municipal policy, customs or and/decision-making by final policymakers, including, but not limited to Upshaw and the Mayor, acting under the color of law, with full knowledge thereof and did not constitute random or unauthorized conduct.

102.     As a direct and proximate result, Pivotal has suffered substantial damages.

WHEREFORE, Plaintiff Pivotal respectfully requests that this Court enter judgment in its favor and against Defendant Village of Broadview, and award:

    a.     Declaratory and injunctive relief requiring the Village to restore the affordable housing component of the Project and comply with applicable federal and state fair housing laws;

    b.     Awarding damages in an amount to be determined at trial pursuant to 42 U.S.C. § 1983;

      c.      Awarding Reasonable attorneys' fees and costs; and

      d.      Awarding such other and further relief as this Court deems just and equitable.

## COUNT IV
### (Breach of the Project Agreements vs the Village)

103.    Pivotal realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 64 (above) as if fully set forth herein.

104.    The Project Agreements constitute a valid agreement pursuant to which the Village was obligated to perform.

105.    Under the Project Agreements, the Village was obligated to lease Village-owned land to Pivotal's affiliate for development of a mixed-use project that included an affordable housing component, consistent with the approved site plan, zoning approvals, and public funding applications.

106.    The Village was further obligated under the Project Agreements to permit Pivotal to proceed with development of the Project in accordance with the terms of the Project Agreements.

107.    Pivotal performed its obligations under the Project Agreements by, among other things, securing public financing, preparing architectural and engineering plans, conducting environmental studies and remediation planning, revising the Site Plan at the Village's direction, soliciting construction bids at the Village's request, and submitting a complete building permit application and Compliance Submission.

108.    The Village has breached the Project Agreements by refusing to proceed in accordance with their terms and by demanding material changes entirely inconsistent with the agreed-upon Project.

109.     The Village further breached the Project Agreements by conditioning continuation of the Project on elimination of the affordable housing component, which was a core and approved element of the Project and the basis for the Village's prior approvals and commitments.

110.     As a direct and proximate result of the Village's breaches, Pivotal has suffered substantial damages, including development costs, professional fees, environmental and financing-related costs, and lost opportunities, in an amount to be proven at trial but exceeding $5,335,292.00.  Pivotal has performed any conditions precedent that may exist under the Project Agreements.

WHEREFORE, Plaintiff, Pivotal respectfully requests that this Court enter judgment in its favor and against Defendant, the Village of Broadview, on Count I of the Complaint as follows:

a.     Awarding damages in an amount to be determined at trial;

b.     Awarding such other and further relief as this Court deems appropriate under the circumstances, including interest and reasonable attorneys' fees and costs; and

c.     Grant such other and further relief as this Court deems just and appropriate.

## COUNT V
### (Unjust Enrichment (*in the alternative*))

111.     Pivotal realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 64 (above) as if fully set forth herein.

112.     Pivotal conferred a substantial benefit upon the Village by investing significant resources in the Project, including, without limitation, securing public financing, preparing architectural and engineering plans, conducting environmental studies, revising the site plan at the Village's direction, and soliciting construction bids.

113.     The Village knowingly accepted and retained the benefit of Pivotal's efforts and expenditures, including the advancement of a mixed-use development that would have created

affordable housing and economic benefits for the community and traffic signal analysis for a nearby intersection, and environmental remediation testing and planning both which advanced the site towards being more development ready or otherwise advanced the interests of the Village.

114.     Under the circumstances, it would be inequitable for the Village to retain the benefits conferred by Pivotal without compensating Pivotal for the costs incurred in reliance on the Village's representations and approvals.

115.     As a direct and proximate result of the Village's retention of the benefits without payment, Pivotal has suffered damages in an amount to be proven at trial but exceeding $5,335,292.00.  Pivotal's damages include,, but are not limited to development costs, professional fees, financing-related costs, and lost opportunities.

WHEREFORE, Plaintiff, Pivotal Housing Partners, LLC, respectfully requests that the Court enter judgment in its favor:

      a.    Ordering the Village to pay Pivotal the reasonable value of the benefits conferred; and

      b.    Awarding such other and further relief as the Court deems appropriate under the circumstances, including interest, costs, and reasonable attorneys' fees.

## COUNT VI
### (Writ of Mandamus Against the Defendants)

116.     Pivotal realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 64 (above) as if fully set forth herein.

117.     Under the Project Agreements, the PD Ordinance, the Village Code, and the Building Code, the Village has a clear, non-discretionary, and ministerial duty to process and issue the requested building permit for the Project.

118.    Pivotal satisfied all conditions required for issuance of the building permit by submitting a complete Permit Application and Compliance Submission, which the Village acknowledged and did not reject or deny in writing.

119.    At that point, the Village had no remaining discretion to withhold permit issuance and had a ministerial duty, as a matter of law, to issue a building permit in accordance with its prior approvals and applicable code provisions.

120.    Notwithstanding Pivotal's full compliance and the Village's ministerial obligation to act, the Village has refused and failed to issue the building permit and has instead attempted to impose new and unauthorized conditions inconsistent with the Project Agreements and prior approvals.

121.    Pivotal has a clear right to the relief requested, the Village has a clear duty to act, and no adequate remedy at law exists absent issuance of a writ of mandamus.

WHEREFORE, Plaintiff, Pivotal respectfully requests that this Court enter judgment in its favor and against Defendant, the Village of Broadview, on Count III of the Complaint as follows:

a.    Issue a writ of mandamus compelling the Village to perform its ministerial duties and issue the building permit for the Project in accordance with the Project Agreements, the PD Ordinance, the Permit Application, the Compliance Submission, and the Village Code; and

b.    Grant such other and further relief as this Court deems just and appropriate.

## COUNT VII
### (Equitable Estoppel)

122.    Pivotal realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 64 (above) as if fully set forth herein.

123.    Through its words and conduct, as discussed above, the Village intentionally and unequivocally represented that the Project was approved and authorized to move forward in accordance with the Project Agreements.

124.    The Village knew or reasonably should have known that Pivotal would rely on these representations in continuing to invest substantial time, resources, and capital into development of the Project.

125.    Pivotal reasonably and foreseeably relied on the Village's representations by, among other things, securing public financing, incurring professional and development costs, conducting environmental remediation planning, revising the Site Plan at the Village's direction, submitting a complete building permit application and Compliance Submission.

126.    After inducing Pivotal's reliance and investment, the Village abruptly reversed course and attempted to condition continuation of the Project on material terms inconsistent with the Project Agreements, including elimination of the affordable housing component.

127.    Pivotal has suffered substantial prejudice as a direct result of its reliance on the Village's representations.

128.    The Village is equitably estopped from denying the validity of the Project Agreements, from repudiating its prior approvals, and from imposing new or inconsistent conditions on the Project.

WHEREFORE, Plaintiff respectfully requests the Court to enter judgment in its favor:

a.      Awarding damages in an amount to be determined at trial; and

b.      Awarding such other and further relief as this Court deems appropriate under the circumstances, including interest and reasonable attorneys' fees and costs.

Dated:  February 25, 2026                     Respectfully submitted,

                                              **PIVOTAL GP HOLDING, LLC,**


                                       By:    */s/ Jillian S. Cole*
                                              One of its Attorneys


Jillian S Cole, Esq.
jcole@taftlaw.com
Derrick M. Thompson Jr., Esq.
dthompson@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, #2600
Chicago, Illinois 60601
Telephone: 312-527-4000


198421580v3